# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 20, 2005　　　　Decided March 17, 2006

No. 04-5340

MISTICK PBT, *D/B/A* MISTICK CORPORATION,
APPELLANT

v.

ELAINE CHAO, SECRETARY,
UNITED STATES DEPARTMENT OF LABOR,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01767)

---

*Maurice Baskin* argued the cause and filed the briefs for appellant. *Lesley A. Pate* entered an appearance.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: HENDERSON, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Under the Davis-Bacon Act, 40 U.S.C. § 3141, *et seq.*, bidders on certain construction projects funded by the federal government must pay workers specified wage rates based upon the type of work performed. *See* 40 U.S.C. § 3142. The Department of Labor (the "Department" or "Secretary") determines the categories of jobs and the prevailing wage rates for those jobs in the community where the construction project will be undertaken. *See* 29 C.F.R. §§ 1.1-1.9. This case involves the Department's conformance regulations, 29 C.F.R. § 5.5(a)(1)(ii)(A), which explain how the Secretary determines the wages for a type of job that is left out of the Department's pre-bid wage decision, but that a contractor subsequently requires for the project. Such omissions are not uncommon.

After it had been awarded a federal contract, appellant Mistick PBT ("Mistick") proposed several types of jobs and accompanying minimum rates of pay that were left out of the Secretary's pre-bid determination. Mistick argues the Department acted in an arbitrary and capricious manner by refusing to evaluate Mistick's proposed wage rates in light of several previously approved types of jobs and accompanying wage rates. The District Court agreed with the Department that because the conformance process results in a wage rate, and because the Supreme Court held in *United States v. Binghamton*, 347 U.S. 171, 176-78 (1954), that the courts have no jurisdiction to review whether the Secretary's wage determination correctly represents the "wages . . . prevailing," 40 U.S.C. § 3142(b), in a locality, the Department's application of the conformance regulations is insulated from judicial review. We disagree with this conclusion. In accordance with our prior decision in *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1451 (D.C. Cir. 1994), we conclude that the Davis-Bacon Act does not provide

clear and convincing evidence that Congress sought to preclude review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, of violations of Department regulations. We hold, however, that the Department did not apply its conformance regulations here in an arbitrary and capricious fashion.

# I.

Mistick won a bid to be general contractor for Crawford Square Rental Phase III ("Crawford Square"), a residential construction project in Allegheny County, Pennsylvania, which was administered by the Urban Redevelopment Authority of Pittsburgh (the "Authority"). Because the project received federal funding and was subject to the Davis-Bacon Act, the Secretary conducted a survey of prevailing wages for similar projects in Allegheny County and issued a wage determination in July 1996 (the "1996 Wage Determination"), which applied to Crawford Square.

Mistick needed to employ seven types of workers not addressed by the 1996 Wage Determination: operators of backhoes, bobcats, excavators, hi-lifts, rollers, graders, and pavers. Mistick requested that the Authority conform these seven types of jobs to classifications found in an earlier wage determination, which was based upon a November 1992 wage survey (the "1992 Wage Determination"). The Authority rejected Mistick's request and concluded that (1) the bobcat classification should be conformed to the wage rates paid to a drywall finisher ($9.75) because the work required of a bobcat operator is "not comparable to the power equipment classifications;" and (2) Mistick's other requested classifications should be conformed to the wage rates paid to bulldozer operators ($21.87) because each involved the operation of power equipment. Mistick objected, contending that the power

equipment operator classifications in the 1996 Wage Determination used by the Secretary were inapplicable here because they addressed equipment needed on a "heavy" commercial land development project and Crawford Square was a "residential" development.

Pursuant to 29 C.F.R. § 5.5(a)(1)(ii)(C), the dispute was submitted to the Department of Labor's Administrator of the Wage and Hour Division of the Employment Standards Administration (the "Administrator"). Mistick requested that two positions—bobcat and roller operators—be conformed to the wage rates paid to drywall finishers ($9.75) and that the other five positions be conformed to the wage rates paid to ornamental ironworkers ($13.36). A section chief rejected Mistick's proposal without stating reasons and approved the Authority's determination; consequently, bobcat operators were assigned a wage rate of $9.75 and the other six positions were assigned a wage rate of $21.87. Mistick appealed to the Administrator. Mistick agreed that the bobcat operator position was properly conformed to the wage rate paid to drywall finishers, but objected to conforming the remaining six classifications to the much higher wage rate paid to a bulldozer operator. These six classifications, Mistick contended, all involved operating "light machinery much closer in nature to a bobcat [which had been conformed to the lower-wage drywall finisher position] than a heavy/highway bulldozer." At most, Mistick argued that these classifications involved the skill of a drywall finisher or an ornamental ironworker.

The Administrator declined to conform the six remaining new classifications to the drywall finisher or ornamental ironworker positions. Instead, the Administrator conformed these positions to the bulldozer classification, citing one of the agency's past decisions, *Tower Construction*, No. 94-17, 1995 WL 90010 (Dep't of Labor, Wage Appeals Bd. Feb. 28, 1995),

for the proposition that the Administrator will not conform power equipment operator positions to non-power equipment operator classifications. The Administrator noted that it made no change to the bobcat classification only because Mistick did not take issue with that conformance. Pursuant to 29 C.F.R. § 7.1(b), Mistick appealed to the Administrative Review Board (the "Board"). Mistick argued to the Board that if the Administrator was going to follow *Tower Construction*, it would be more reasonable to conform the six new equipment operator positions to the conformed bobcat operator classification and not the more highly skilled bulldozer classification. Mistick also argued that *Tower Construction* was ill-reasoned and that it was arbitrary for the Administrator to compare Mistick's requested classifications only to power equipment operator positions.

The Board rejected Mistick's challenge but did not offer any findings why these new classifications differed from the bobcat classification. Instead, the Board relied upon procedural grounds and concluded that it need not compare Mistick's six requested classifications with the bobcat classification. The Board also determined that the Administrator properly followed *Tower Construction* by comparing Mistick's six remaining requested classifications only to power equipment operator positions.

On August 20, 2003, Mistick filed a complaint in the United States District Court for the District of Columbia alleging violations of the Davis-Bacon Act and the APA. The District Court held that *Binghamton* precluded judicial review of Mistick's challenge to the Department's application of its conformance regulations because "the essence of Mistick's challenge falls upon the correctness of the Department's decision rather than the actual procedure that the Board employed." *Mistick PBT v. Chao*, No. 03-1767, slip op. at 8, 2004 WL 3517425, at *4 (D.D.C. July 27, 2004). In the

alternative, the District Court held that there was nothing arbitrary and capricious about the Board's decision to conform the six new classifications to one of the pre-existing power equipment classifications as opposed to any of the non-power equipment classifications. Mistick filed a timely notice of appeal, invoking our jurisdiction under 28 U.S.C. § 1291 to review the final decision of the District Court.

## II.

To understand the dispute in this case, some background is needed on the wage determination process employed prior to a construction firm's bid for a federal contract and the subsequent conformance process set forth in the Department's regulations. The Board provided a helpful summary of both processes in its opinion, setting out the "fundamental differences" between the two processes:

> A wage determination dictates the minimum wage rates paid to classifications of employees. It is incorporated into bid packages and ultimately into the contract. Thus all bidders are provided with the same information concerning the minimum wage rates that must be paid on a federal procurement. The Administrator typically engages in extensive analysis of statistical data in determining locally prevailing or collectively-bargained rates. Interested parties must challenge wage determinations prior to submissions of bids on procurement. This requirement ensures an equitable procurement process in order that competing contractors know in advance of bidding what rates must be paid so that they can bid on an equal basis.

> A conformance, on the other hand, entails adding an employment classification omitted from a wage

determination. Conformance occurs after the conclusion of bidding on the contract and assumes that the wage determination that was included in the bid specifications essentially is correct with the limited deficiency that a needed job classification and wage rate are missing. The conformance mechanism is designed to facilitate expedited addition of a missing classification and wage rate while simultaneously maintaining the integrity of the bidding procedure. The Administrator must (i) determine which classification already listed in the wage determination is most comparable in terms of skill to the class of employee performing under the contract but omitted from the wage determination, and (ii) derive a wage rate for the omitted class which is reasonably related to the listed rates. The Administrator is not required to conduct a wage survey or to issue a de novo wage determination in order to effect a conformance.

*Mistick Constr.*, No. 02-004, slip op. at 6-7, 2003 WL 21488362, at *5 (Dep't of Labor, Admin. Review Bd. June 24, 2003) (quotation marks, internal citations, and alterations omitted). Thus, for a wage determination, the Department conducts a survey of wages paid for various jobs in a locality in which a federal construction project is to take place. Bidders must challenge those determinations prior to bidding. If they do not, and are awarded the government contract, they must pay their workers the wages set forth in the wage determination. The conformance process, on the other hand, occurs after the Government and bidder have signed a contract and requires the Secretary to undertake a substantially different task. The conformance process recognizes that there is a "missing classification and wage rate" necessary to the project and provides a means by which the Secretary can derive, in a manner that maintains the integrity of the bidding process, a new

classification based upon the "most comparable" existing classification and a wage rate "reasonably related" to existing rates.

## III.

In *United States v. Binghamton*, 347 U.S. 171 (1954), a successful bidder for a Davis-Bacon contract sought damages from the Government because the wage determination upon which its bid was based contained wage rates that were too low and left it "unable to obtain workmen at the rates specified in the contract schedule . . . ." *Id.* at 175. The Court rejected the bidder's claim and held that when the Secretary determines what wages are "prevailing" in a locality, *see* 40 U.S.C. § 3142(b) (formerly 40 U.S.C. § 276a), that determination is not an "affirmative representation" that the bidder is "entitled to rely on . . . in the computation of its bid." 347 U.S. at 175. While the Act provides a cause of action for "employees to recover from the contractor the amount due the employees under the minimum wage schedule," *id.* at 177 n.12, "[t]he Act does not authorize or contemplate any assurance to a successful bidder that the specified minima will in fact be the prevailing rates," *id.* at 178. Thus, "[t]he correctness of the Secretary's determination is not open to attack on judicial review." *Id.* at 177.

Discussing *Binghamton*, the Supreme Court has since noted that while the "correctness of the Secretary's wage rate determination is not subject to judicial review[,] . . . [a]t least two Courts of Appeals have held, however, that the *practices and procedures* of the Secretary are reviewable under the standards of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*." *Univ. Research Assoc., Inc. v. Coutu*, 450 U.S. 754, 761 n.10 (1981) (citing *Virginia v. Marshall*, 599 F.2d 588, 592 (4th Cir. 1979); *N. Ga. Bldg. & Constr. Trades Council v. Goldschmidt*, 621 F.2d 697, 707-08 (5th Cir. 1980)) (emphasis

added; additional citation omitted). The Court, however, "express[ed] no view on the latter question." 450 U.S. at 761 n.10.

The Department argues that this case falls within the category of decisions that *Binghamton* holds are not subject to judicial review. We disagree with the Department and conclude that the Department's application of its conformance regulations is subject to judicial review under the Administrative Procedure Act. Under the conformance process, as prescribed by 29 C.F.R. § 5.5(a)(1)(ii)(A)(3), the Secretary must determine whether a proposed rate reasonably relates to existing rates in the wage determination. The Department argues that because the result of the conformance process is the determination of a wage rate, *Binghamton*'s bar applies and the Department's application of the conformance regulations must also be immune from judicial review under the APA.

But this argument reads too much into *Binghamton*. *Binghamton* determined only that the Davis-Bacon Act does not provide contractors a cause of action for challenging, as the Fourth Circuit put it, the "substantive correctness of the wage determination . . . ." *Marshall*, 599 F.2d at 592. *Binghamton* does not grant the Department license to arbitrarily apply its own regulations with respect to a government contractor and escape all APA review of its practices and procedures in its dealings with a contractor. *Binghamton* does not refer to the APA nor otherwise address in any way the extent to which a contractor may seek APA review of whether the Department acted arbitrarily in applying its practices and procedures.

Indeed, we have previously reviewed a facial challenge to the validity of the conformance regulations. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 276 (D.C. Cir. 1992), *cert. denied*, 506 U.S. 915 (1992). The litigation over the

validity of parts of the conformance regulations in *Martin* demonstrates that the conformance process is not, contrary to the District Court's suggestion, simply something that reflects the Secretary's view of what are the "correct" prevailing wages in a community. As the Department explained, "[t]he conformance mechanism is designed to . . . maintain[] the integrity of the bidding procedure. . . . The Administrator is not required to conduct a wage survey or to issue a de novo wage determination in order to effect a conformance." *Mistick Constr.*, slip op. at 7, 2003 WL 21488362 at *5. The conformance regulations set out a specific and critical regulatory process that allows the Department to exercise binding discretion over contractors and employees in filling a contractual gap, based upon specific standards in 29 C.F.R. § 5.5(a)(1)(ii)(A) that look not to prevailing wages but what new wage rates would reasonably relate to rates in the wage determination. As *Binghamton* does not answer the question before us, we employ the familiar framework for determining whether Congress has precluded a party from seeking APA review of an agency's practices and procedures.

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and allows for judicial review "except to the extent that . . . (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," 5 U.S.C. § 701(a). *See also id.* § 702(1). With respect to the first exemption, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (quoting *Rusk v. Cort*, 369 U.S. 367, 380 (1962)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The second exemption "is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

The Department directs us to nothing in the Davis-Bacon Act, let alone clear and convincing evidence, demonstrating that Congress sought to preclude judicial review of the Secretary's compliance with the conformance regulations or, looking even to the broader administrative activity at issue here, the Department's alleged failure to follow its own regulations in its post-bid dealings with a contractor. Nor are we aware of any such provision. The Department does not argue that the conformance regulations are so broad as to constitute one of those "rare instances" where there is no law to apply. To the contrary, the conformance regulations set out specific criteria that are capable of review. The Department argues instead that we should employ "a pertinent presumption of statutory construction that Congress knows how to create a cause of action when it wants to" and presume that Congress did not intend for review of the conformance process. As *Abbott Laboratories* makes clear, however, the presumption we are to apply cuts the other way. Under the APA, absent clear and convincing evidence to the contrary, we must presume that Congress did not intend for the Department to be insulated from judicial review in applying the conformance regulations.

Indeed, although not addressed by the Department, we have previously applied the same *Abbott Laboratories* analysis to the Davis Bacon Act:

> The Secretary . . . cannot adopt regulations erasing the presumption of reviewability embodied in the APA unless the Davis-Bacon Act reveals clear and convincing evidence that Congress intended to

foreclose judicial review of the Secretary's regulations under the Act when those regulations are applied in later adjudicatory proceedings. . . . [W]e find nothing in the Act indicating such to be the case . . . .

*Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450-51 (D.C. Cir. 1994) (quotation marks omitted). That conclusion echoes the Fourth Circuit's holding in *Marshall*, the Fifth Circuit's determination in *Goldschmidt*, and the decisions reached by several district courts.[1] The Department has not directed us to any court that has departed from that conclusion.

The role of the conformance regulations under the Davis-Bacon Act demonstrates why Congress has not sought to preclude APA review. During the wage determination process, a contractor unhappy with the Department's interpretation of the relevant regulations can protect itself simply by not bidding on a Davis-Bacon project. But where, as here, a bid has been accepted, a contractor faced with arbitrary and capricious administrative action would not have such an option. Even though the contractor entered the contract and began performance in reliance on the good faith of the Department to follow its conformance regulations, the Department's proposed exemption from judicial review would require the contractor to keep performing regardless of whether the Department assigned wage rates to missing classifications in an arbitrary and capricious fashion. There would not just be "no other adequate remedy in a court," 5 U.S.C. § 704, for the agency's allegedly capricious action; in fact, there would be no remedy at all.

Absent clear and convincing evidence from Congress to the

---

[1] *Accord Miree Constr. Corp. v. Dole*, 730 F. Supp. 385 (N.D. Ala. 1990); *Framlau Corp. v. Dembling*, 360 F. Supp. 806 (E.D. Pa. 1973).

contrary, we decline to conclude that the Department may apply its conformance regulations outside the limits of the Administrative Procedure Act. We have jurisdiction to review Mistick's challenge to the Department's application of the conformance regulations.

## IV.

Mistick takes issue with the Department's application of the third step of the conformance regulations, which requires the contracting officer to determine whether "[t]he proposed wage rate . . . bears a reasonable relationship to the wage rates contained in the wage determination." 29 C.F.R. § 5.5(a)(1)(ii)(A)(3).[2] The Department concluded that the six

---

[2] The three steps necessary for a conformance are found in 29 C.F.R. § 5.5(a)(1)(ii)(A), which provides:

> The contracting officer shall require that any class of laborers or mechanics, including helpers, which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage determination. The contracting officer shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:
>
>> (1) The work to be performed by the classification requested is not performed by a classification in the wage determination; and
>>
>> (2) The classification is utilized in the area by the construction industry; and

new classifications requested by Mistick bore a reasonable relationship to the bulldozer operator classification in the 1996 Wage Determination. Mistick challenges two aspects of how the Department reached that decision.

A. *Consideration of Only Other Power Equipment Operator Positions.*

Mistick argues that the Department's decision was arbitrary and capricious because it failed to conform the proposed classifications, each of which involved operating power equipment, to the lower-paid drywall finisher or ironworker classifications. The Administrator declined to do so because agency precedent determined that "power equipment operators are a separate and distinct subgroup of construction worker classifications." *Tower Constr.*, No. 94-17, 1995 WL 90010, at *2 (Dep't of Labor, Wage Appeals Bd. Feb. 28, 1995). Following *Tower Construction*, the Administrator would only compare Mistick's requested classifications to other power equipment operators. The Administrative Review Board agreed.

"This Court affords great deference to an agency's interpretation of its own regulation: under well-recognized precedent, we can reject the Secretary's interpretation only if it is plainly erroneous or inconsistent with the regulation." *Sec'y of Labor v. Twentymile Coal Co.*, 411 F.3d 256, 260 (D.C. Cir. 2005) (quotation marks omitted); *see Bowles v. Seminole Rock*

---

(3) The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.

*Id.*

*& Sand Co.*, 325 U.S. 410, 414 (1945). The conformance regulations require only a reasonable relationship between "[t]he proposed wage rate" and "the wage rates contained in the wage determination." 29 C.F.R. § 5.5(a)(1)(ii)(A)(3). Applying that standard, the Department concluded in *Tower Construction* that power equipment operators have unique skill sets that make them different from other workers, and that it is reasonable to conform omitted power equipment operator classifications to wage rates for power equipment operator classifications in the applicable wage determination.

That reading of the reasonable relationship standard is far from erroneous or inconsistent with § 5.5(a)(1)(ii)(A)(3). In *Tower Construction*, the Department did what the regulations expect and require. It employed its expertise with regard to the skills required for various jobs and developed a uniform, fair approach to conforming requested power equipment operator classifications. We defer to that interpretation of § 5.5(a)(1)(ii)(A)(3).[3]

---

[3] Mistick argues that *Tower Construction* is inconsistent with an earlier decision of the Department, *Clark Mechanical Contractors*, No. 95-03, 1995 WL 646572 (Dep't of Labor, Wage Appeals Bd. Sept. 29, 1995). There, the Wage Appeals Board concluded that the Administrator properly conformed a requested plumber classification, a skilled classification, to "the lowest rate for a skilled classification above the unskilled classification of laborer." *Id.* at *4. That is, the Administrator properly compared a proposed skilled classification with existing skilled classifications in a wage determination and not with any existing unskilled classifications. Mistick argues that, under *Clark Mechanical*, the Department "should [have] set a rate for a conformed skilled classification equal to any skilled classification rate, without arbitrarily limiting the rate to any particular category of skilled classifications . . . ." Nothing in *Clark Mechanical*, however, prevents the Department from determining that differences exist among skilled classifications and that power equipment operators have

B.  *The Earlier Bobcat Conformance.*

If all of the power equipment operator positions that Mistick requested had been conformed to other power equipment operator positions, our task would be straightforward and complete.    But, as Mistick notes, the bobcat operator classification Mistick requested—a power equipment operator position—was conformed to the drywall finisher classification. Because the Administrator was willing to conform the bobcat operator classification to a non-power equipment operator position, Mistick argues that the Administrator acted arbitrarily in refusing to consider conforming Mistick's other requested classifications to non-power equipment operator positions.

"Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (quoting *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)) (quotation marks and alterations omitted).  Viewed out of context, allowing the bobcat operator classification to be conformed to a non-power equipment operator classification might appear to be not only a departure from *Tower Construction*, but an unexplained departure from the Department's decision to not consider non-power equipment operator classifications in reviewing Mistick's proposed classifications.

But the Department did offer a reasoned explanation why the bobcat classification was not conformed in accordance with *Tower Construction*.  After the Authority agreed to conform the

---

unique skill sets that merit a separate subclassification.   To the contrary, *Tower Construction* follows the path set out in *Clark Mechanical* by developing a uniform standard for conforming requested classifications.

bobcat classification to the wage rate of a drywall finisher, Mistick, acting on counsel, chose not to protest that determination. The Administrator, and the Board, noted that had Mistick protested the wage rate assigned to the bobcat classification, "we would have given further consideration to any evidence that the rate approved did not bear a reasonable relationship with the other power equipment operator rates." *Mistick Constr.*, slip op. at 8, 2003 WL 21488362 at *7. Had Mistick protested the bobcat rate, there is a likelihood that the Department would have required that bobcat operators be paid a higher wage rate reasonably related to the wage rate paid to an existing power equipment operator.

Mistick argues that once the Department created the bobcat classification and its corresponding relatively low wage rate, it had a duty to consider whether Mistick's six other new classifications bore a reasonable relationship, *see* 29 C.F.R. § 5.5(a)(1)(ii)(A)(3), to the bobcat classification. Given that the bobcat classification is a power equipment operator classification and assuming therefore that it was a proper subject for comparison under *Tower Construction*, Mistick argues that the Department's failure to compare the six new classifications to the newly conformed bobcat classification was itself arbitrary.[4]

An agency's "failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious. Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned." *Tesoro Alaska Petro. Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) (citing *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 648 (D.C. Cir. 1973); *City of Vernon v. FERC*, 845 F.2d

---

[4] Although this argument was raised below, the District Court did not address it.

1042, 1048 (D.C. Cir. 1988)). Despite Mistick's request to do so, the Department did not consider whether the six new classifications Mistick requested bore a reasonable relationship to the bobcat classification. Instead, the Department concluded that three procedural grounds prevented it from looking at the bobcat classification: (1) "the bobcat conformance in no manner 'amended' the general wage determination," as the 1996 Wage Determination continues to list only "three classifications of power equipment operator" and not the new bobcat classification requested by Mistick for this project; (2) "[c]onforming the disputed classifications rather than 'amending' the existing wage determination is consistent with the language of the [conformance] regulation[s]," which "require[] that a class of laborers or mechanics 'which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage determination,'" and contemplate that "the wage rate proposed for the classification must 'bear[] a reasonable relationship to the wage rates contained in the wage determination;'" and (3) "[e]ven assuming that the wage determination effectively is amended in some manner, . . . [w]e consider [the 1996 Wage Determination] as it existed on the date of the request until all conformance issues associated with the request are resolved." *Mistick Constr.*, slip. op. at 9, 2003 WL 21488362 at *7-8 (quoting 29 C.F.R. § 5.5(a)(1)(ii)(A)).

There is some textual support for Mistick's suggestion that the conformed bobcat rate is now another wage rate to which proposed wage rates should be compared. The conformance regulations indicate that after a requested wage rate has been "classified in conformance with the wage determination" the "contracting officer shall approve" it as "an *additional* classification." 29 C.F.R. § 5.5(a)(1)(ii)(A) (emphasis added). But Mistick's interpretation of 29 C.F.R. § 5.5(a)(1)(ii)(A) is not the only possible interpretation of that regulation. The

Department notes that § 5.5 speaks of conforming a new classification to classifications and wage rates found "*in the wage determination*." 29 C.F.R. § 5.5(a)(1)(ii)(A)(3) (emphasis added). The text of the regulation thus reasonably can be read to suggest that a new classification should only be compared to classifications appearing in the original wage determination and does not require that requested classifications be compared to classifications previously created through the conformance process.

Even though Mistick's interpretation may be possible, it is not the Department's interpretation of its own regulation. We can "reject the Secretary's interpretation only if it is plainly erroneous or inconsistent with the regulation." *Twentymile Coal*, 411 F.3d at 260 (quotation marks omitted). Nothing about the Department's reading of its regulation is plainly erroneous or inconsistent with the text of the regulation. Accordingly, the Department did not act arbitrarily under the conformance regulations in refusing to compare Mistick's six requested classifications to a classification previously determined through the conformance process.

## V.

For the foregoing reasons, we affirm the order of the District Court granting the Department's motion to dismiss.

*So ordered.*